Filed 8/23/16  P. v. Renteria CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GERMAN RENTERIA,<br><br>    Defendant and Appellant. | 2d Crim. No. B262367<br>(Super. Ct. No. 2014026677)<br>(Ventura County) |

A jury convicted German Renteria of carrying a loaded firearm in public (Pen. Code, § 25850, subd. (c)(6))[1] and assault with a semiautomatic firearm (§ 245, subd. (b)).  The jury found true criminal street gang and personal firearms use allegations.  (§§ 186.22, subd. (b)(1), 12022.5, subd. (a)(1).)  He was sentenced to 16 years in prison—6 years for the assault plus 10 years for the gang enhancement and a concurrent two-year term for carrying a loaded firearm.  The trial court stayed the firearms use enhancement.  (§ 654.)

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

Renteria contends that substantial evidence does not support the gang enhancement and that the trial court erred by admitting into evidence rap lyrics and a video of him rapping. We affirm.

## FACTS

### *Carrying a Loaded Firearm*

Angela Forhan was driving Renteria and her cousin, Eric Medrano, around Santa Paula. Medrano was a member of the Crimies gang. From the back seat, Renteria fired a gun out of the window two or three times.[2] Forhan dropped off Renteria at his house. Ten minutes later, the police stopped her while investigating a "shots fired call." They recovered a nine-millimeter shell casing from the rear seat of the vehicle.

Six months later, Officer Joash Rothermel encountered Renteria in front of Renteria's house in Santa Paula. When Rothermel got out of his vehicle to talk to him, Renteria ran away. Rothermel caught up and grabbed him. Renteria said "he was just trying to take a piss." The next day, Renteria's next-door neighbors found a nine-millimeter semiautomatic handgun in their yard near the fence along the property line. They contacted the police. The gun was loaded with 12 rounds of ammunition. Forensic expert Geoff Bruton compared the casing from a test-fired cartridge with the casing recovered from the back seat of Forhan's car and concluded based on microscopic markings that both had been fired from the same gun.

### *Assault*

Renteria and Yesenia Calderon were in a relationship for three years. They "had problems." "[H]e would tell [her] that he was never gonna let [her] be

---

[2] This was the account that Forhan gave the police as well as her testimony on direct examination. On redirect, she testified that Renteria handed the gun to Medrano, who fired the shots and handed the gun back. She admitted at trial that she was "scared" to testify because Renteria was "ruthless."

happy with anybody else" and "[t]hat whoever he saw [her] with, he was gonna beat 'em up." About six months after their second child was born, they "split up" and Calderon moved out. Subsequently, Renteria did not speak to her or see their children. He "sent a message" to her sister that he did not "want . . . any dudes around [his] kids."

The next year, Calderon began dating Jesus Ochoa. They had known each other for about five years before becoming boyfriend and girlfriend. One evening they were talking in front of her apartment building when a car passed by "with the radio real loud." It made a U-turn and "came back again." Renteria was alone in the car.

Ochoa believed that Renteria was associated with the local Crimies gang because "the minute he came back" in the car he "was waving gang signs," in particular the letter "C" that he made with his hand. Ochoa interpreted this to mean that Renteria was "trying to let [him] know that he's a gang member" and was warning him to stay away from Calderon, in effect saying "this is my crew and this is what's gonna happen to you if you're here again."

Calderon also thought Renteria "was saying he was like a Crimie or something" when he made a "C" shape with his hand that she thought was a gang sign. She knew he had cousins who were Crimies and he used to say "he was gonna be a Crimie."

Renteria pulled into her driveway and "came out of the car real aggressively." He said, "Ora," meaning "what." He was "brandish[ing] a firearm," which he pointed at Ochoa. Ochoa ducked because he was scared Renteria was going to shoot him. Renteria put his hand on top of Ochoa's neck and beat him with the bottom of the gun "really, really hard" about six times. Ochoa ran away, fearing for his life. Renteria got in his car and left. As he was leaving, Calderon heard him say something gang-related but she could not remember what it was.

3

Ochoa felt a lot of blood dripping from the back of his head. He drove himself to the hospital, accompanied by Calderon. He had three lacerations that would have required about nine stitches to suture, but he refused treatment. A nurse called the police. In separate interviews, Ochoa and Calderon told them what had happened. Ochoa identified Renteria from a "six-pack" photographic lineup. He was "110 percent" positive that Renteria was the person who assaulted him.

Calderon asked that the police "not mention [her] name," stating, "I don't want to be involved" because "I have kids. And . . . I know the kind of person [Renteria] is." A few weeks later, Ochoa called Sergeant Kenneth Clark, saying he did not want to prosecute the case because "it would be best for his safety." Ochoa "felt that even if the suspect was in custody, that [the suspect] could have somebody on the outside get to him." Someone "on the street . . . told him . . . that someone was going to come after him if he continued or he didn't drop charges in the case."

At trial, Calderon testified that she lied about the assailant being Renteria because she was mad after hearing that he "was with" one of her relatives. She did not know who the assailant was. At the time Ochoa was assaulted, she was also dating someone from Oxnard who was a member of the Colonia gang.

Ochoa testified that his assailant said "Colonia" when he made a "C" sign. It was not Renteria. On the way to the hospital, Calderon told him to say that his assailant "was this guy named German." She told him, "'He's been giving me hard problems, and I just want him out of here.'"

*Gang Evidence*

Detective Allen Macias supervised the gang unit of the Santa Paula Police Department. He testified as both an investigating officer and as a gang expert. He explained that Santa Paula has five main Hispanic-oriented gangs. One, the Crimies, has about 50 active members. Their primary activities are assaults, robberies, drug dealing, and burglary.

4

Gang members identify themselves in various ways, including using hand signs, wearing sports team paraphernalia, spray painting their gang name in the area they claim, and getting tattoos. A non-member who wears gang clothing or has a gang tattoo "could get beaten up severely and/or killed" because the person has not earned that privilege by being initiated into the gang. Crimies wear sports paraphernalia with the letter "C," such as the Chicago Cubs or the Cincinnati Reds. They use a hand sign made by forming the letter "C."

The purpose of "throwing out" gang signs is to intimidate a rival gang member during a confrontation. The gang sign implies that if the gang member is challenged, the challenger will have to deal not only with that particular gang member but also with others from his gang. Gang members intimidate witnesses by sending intermediaries to their houses and telling them that there will be "hell to pay" if they testify against the gang member.

Four days after Ochoa was assaulted, Macias searched Renteria's house. In his room, they found a blue hat embroidered with "CMS," the abbreviation for "Crimies." They found a black hat with the letter "C" on it. They also found photos of other Crimies members. In addition, they found rap lyrics. Macias opined that "[t]he Hispanic gang rap scene is pretty huge now in Southern California. What they do is they rap, meaning write music, regarding . . . their criminal activity, where they're from and what they'll do if you cross them."

The rap lyrics began, "'Still roll around in the calle [street]' . . . 'with a mother fucking nine [millimeter gun]' . . . 'in my damn pocket.'" The lyrics also stated, "'I don't see you lames, mother fuck the west.'" Macias explained that "'lames' is a slang term, pretty much disrespecting and degrading a rival gang member or an individual they don't like." The Crimies "claim the east side of Santa Paula" as their territory. "[T]he west [side] is claimed by another gang."

The lyrics also stated, "'All you fools are fake. Go ahead and run your mouths. You're nothing but a fucking clown.' 'I'm going to get to popping [shooting]' all these rounds towards your brain. This is Crimies gang, and I'm banging until my death.'" Macias interpreted this passage to mean that "I'm down for mine, and I'm going to go to whatever extreme it takes to show you that, hey, we're the Crimies gang, and we'll do anything to show you this is our territory."

Approximately 13 months after the assault, Macias spoke with Dolores De Los Reyes, a probation officer, who gave him a cell phone belonging to probationer Alberto Perez, a documented member of the Crimies gang. The phone contained a video of Renteria rapping, which was played for the jury.[3] In the video, Renteria shows a hat with the letter "C" and makes a gang sign consistent with the "C" associated with the Crimies. Macias concluded that, "based on [Renteria's] throwing up the first initial of the gang, 'C,' and [then] assaulting the victim with a firearm," he was an active member of the Crimies at the time.

The following month, Renteria was stopped for driving at a high rate of speed. A man sitting in the front passenger seat fled and another passenger

---

[3] The lyrics were as follows: "Fuckin' right here, dude. I'm gonna sing something, okay? (UNINTELLIGIBLE) I just want to try and set it straight. (UNINTELLIGIBLE) around the corner with the motherfuckin' (UNINTELLIGIBLE) they want to come my way, I'm ready to spray any day in the motherfuckin' light of broad day. All day the C gang don't give a fuck. We just want trip, end up in the ditch. That's a consequence of smoking all that Mary Jane, just to get tame. I'm still posted up, trying to win a name. Hanging with my block, yeah, smokin' (UNINTELLIGIBLE) in the game. (UNINTELLIGIBLE) until I fuckin' drop (UNINTELLIGIBLE) get shot. Fuck 'em. They ran as we got there, but we're the ones that (UNINTELLIGIBLE) keep you boys down. Yeah. 'Cause like I said we represent the motherfuckin' C, I represent to my death. Fools (UNINTELLIGIBLE) I don't give a shit. Motherfuckers want to come my way, I got the 12-gauge. Just proving it, dropping (UNINTELLIGIBLE) the homies. And they just ran up and said are you posing. What's (UNINTELLIGIBLE) still. Posted up on the block we tryin' to get real so just puffing on that Mary Jane (UNINTELLIGIBLE) all day. I shot them punks."

remained in the back seat. Rap lyrics were found in the center console between the driver and passenger seats. Macias read to the jury "significant phrases and words" from the lyrics.[4] One lyric was, "'You got the huras [a street slang term for

---

[4] Macias's testimony, in its entirety, was as follows: "The first line says, 'Putting through the east bitch, catch you.' The term 'east' is—like I explained earlier, from the map, the east side of Santa Paula is the geographical area the Crimies claim.

"Says, 'That's the way we handle business always in the snake pit.' 'Snake pit' is a moniker for the city of Santa Paula. 'Vatos want to talk shit. Homie keep on barking. When I catch you slipping, ain't no doubt I'm fucking dumping.' What that means is that 'vatos' is a street slang term for homeboy. So basically what he's saying, that I've interpreted is that, hey, listen, you're the homeboy. Want to talk shit. Go ahead and keep on barking, keep on talking your crap. When I catch you slipping, meaning when I catch you off guard, ain't no doubt—self-explanatory—I'm going to fucking dumping. 'Dumping' is a street slang term of emptying a gun, shooting.

"'All you all better duck quick because I don't give a fuck. Even in the broad day, I'm aiming at your fucking brains. Spill them on the pavement. Pin up on the A.M. Got the huras [and] the [coroners] with the caution tape.'

"Well, I interpret that is even in the daylight when people can witness a shooting, they will still go to the extreme and go after their target, who they're targeting.

"'You got the huras,' which is the street slang term for police, 'and the coroners,' the medical examiner's office, 'with the caution tape,' meaning the tape around a crime scene, 'saying who is there to blame. Witnesses don't give no name.' Meaning the witnesses won't give their name. [']They don't want to end up like them.' 'Them' I interpret is the person out there that they're going to shoot with the brains on the pavement.

"'So they better not say that's the way the game is played. That's to look the other way. 805 stays active on that gangster way, too.'

"Basically saying this is how we run stuff. This is how we do it in the 805.

"On Exhibit No. 40 it says, 'And the homies hit me up when they raid the pad. They tell me, "Hide the heat and money and the other stash."'

"Basically what he's saying is when the police are out there either doing search warrants, probation searches on residences up in the city of Santa Paula or any other jurisdiction, to hide the heat. 'Heat' is a street slang term for a gun and the money, which I interpret from proceeds from drug dealings and the other stash, meaning the drugs, that I interpret, the drugs.

7

police]' . . . 'and the coroners' . . . 'with the caution tape' . . . 'saying who is there to blame. Witnesses [to a shooting] don't give no name. . . . They don't want to end up like them [i.e., the victim].'"

The prosecutor asked Macias about a hypothetical situation in which "an active gang member . . . sees somebody with his ex-girlfriend, [the] mother of his kids. [He] [d]rives by in a vehicle and exits, flashes the gang sign belonging to his gang, a gang sign that he's flashed on rap videos. He points a semiautomatic firearm at the victim's head, proceeds to say either 'what' or 'ora,' something similar in Spanish, and hits this individual on the back of the head at least three times with the semiautomatic firearm." Macias opined that the gang member was "using his gang to intimidate the victim." He reasoned that it promotes or further assists the gang's criminal conduct by elevating the gang's status. The crime is reported in the newspapers as a gang crime, which members of other gangs see.

DISCUSSION

*Gang Enhancement Evidence*

Renteria contends that there is insufficient evidence to prove that he committed the crime either "for the benefit of, at the direction of, or in association with" the Crimies or "with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) We disagree.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is

"'Just a normal life would be a 9:00 to 5:00, come home and be with the wife, but something in my head keeps telling me it's crime time.' Essentially saying, I understand that I can live a normal life, but I choose not to. I choose to live the life, the life of a Crimies gang member."

subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) The substantial evidence standard also applies to gang enhancement findings. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.)

Renteria concedes that there is substantial evidence that he was a gang member but argues that his motives were purely personal—he was jealous about Calderon's new relationship with Ochoa—and the assault had nothing to do with his gang. He points out that he committed the assault alone, without other gang members present, and that the victim was not a rival gang member.

Renteria's personal motive for assaulting Ochoa does not preclude an additional, gang-related motive, which is all the statute requires. (See *People v. Albillar* (2010) 51 Cal.4th 47, 62 ["[T]he jury, which was presented with the competing inferences [regarding the defendants' motives], was entitled to credit the evidence that the attack . . . was gang related"].) Renteria committed the offense with a telltale sign of acting to benefit his gang: he flashed a gang symbol. (See *People v. Ochoa* (2009) 179 Cal.App.4th 650, 663, fn. 9 ["[E]ven if the . . . victim was not a gang member, substantial evidence would have supported the true findings on the [gang enhancements] if defendant had been shown, in some other manner, to have had a gang purpose in mind when he committed the . . . offense, e.g., by shouting his gang name, throwing gang signs, or otherwise demonstrating that he was seeking to intimidate the . . . victim on his gang's behalf"].)

Citing *In re Cesar V.* (2011) 192 Cal.App.4th 989 (*Cesar V.*) and *People v. Margarejo* (2008) 162 Cal.App.4th 102 (*Margarejo*), Renteria

9

acknowledges that "[t]he flashing of gang signs at the time of an offense can be evidence from which a trier of fact can reasonably infer that the offense was committed for the benefit of the gang and with the specific intent to promote the criminal activity of any gang member." He attempts to distinguish *Cesar V.* and *Margarejo* by asserting that "[those] defendants displayed their gang affiliations in a very public manner." The public manner was irrelevant in *Cesar V.* because, as here, the gang signs were made on a public street but directed at specific persons, not the public at large. In *Margarejo*, the gang signs were directed at both specific persons—the pursuing police officers—and the public at large, with the purpose of intimidating both. (See *Margarejo*, 162 Cal.App.4th at pp. 109-110.) The defendant's intimidating the public was relevant only because the crime itself— evading the police during a long car chase—had no victim and the only witnesses were the police and members of the public. Here, similar to *Margarejo*, the gang expert testified that a gang member making a gang sign before committing an assault would be "using his gang to intimidate the victim."

That Renteria apparently only made a gang sign once did not lessen its intended effect. The gang expert explained that Santa Paula is a "small town" and "most of the younger generation . . . have a rough knowledge of the gangs" there. The purpose of confronting someone with a gang sign is to intimidate, signaling that the person would "not only have to deal with [that particular gang member], but . . . with 50 other members." Ochoa understood this. He interpreted Renteria's gang sign as saying, "this is my crew and this is what's gonna happen to you if you're here again."

Renteria also assails the gang expert's conclusion that he was "putting [the assault] out there for his gang" because it elevated his status within the Crimies. He asserts that this opinion was improper because there is no evidence in the record to support it. The gang expert testified without objection that when a

10

gang member "flashes the gang sign belonging to his gang" before assaulting a victim, "[it's] deemed in the newspapers as a gang crime." This was proper expert testimony.

*Admission of the Rap Lyrics and Video*

Renteria contends that the trial court erred by admitting evidence of the rap lyrics recovered from the center console of a car he was driving and the video of him rapping found on the cell phone of another Crimies member.[5] He argues that it was irrelevant (Evid. Code, § 350), more prejudicial than probative (*id.* § 352), improper character evidence (*id.* § 1101), and violated his constitutional rights to due process and a fair trial.

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

The rap evidence was properly admitted. The gang expert explained its relevance to the jury: "The Hispanic gang rap scene is pretty huge now in Southern California. What they do is they rap, meaning write music, regarding . . . their criminal activity, where they're from and what they'll do if you cross them." The rap lyrics "demonstrated his membership in [the Crimies], his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the [assault]." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.)

The lyrics also supported the gang expert's opinion that gang members intimidate witnesses from reporting their crimes to the police, in particular

---

[5] Renteria does not challenge the admission of the rap lyrics found in his room.

11

the line that witnesses to a gang crime "don't give no name" to the police because "[t]hey don't want to end up like" the victim. This evidence linked Renteria's gang sign with Ochoa's and Calderon's reluctance to testify and their recanting of statements to the police incriminating him. Moreover, given that the only witnesses changed their story, the rap video of Renteria making a "C" sign in an aggressive, threatening manner was crucial to corroborate their initial version of events.

Renteria argues the admission of the rap evidence was more prejudicial than probative because "whether or not [he] belonged to a gang was not the issue in the case." To the contrary, his gang membership was very much at issue. Defense counsel told the jury, "I don't agree . . . that . . . Mr. Renteria is a gang member."

Renteria also argues that the rap evidence recovered more than a year after the assault was "irrelevant to a finding that he acted on behalf of the gang." "[T]his was not a case in which the date of creation of the work was critical." (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1373.) Renteria was a member of the Crimies at the time of the assault and their intimidation tactics continued over time. Ochoa testified that, two months later, a man who "might have been" his assailant told him "to stay away from [the man's] girlfriend," referring to Calderon, "said some [gang] type of stuff," and drove off.[6] The rap lyrics and video were not so remote as to be inadmissible. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1138 [defendant's statements that he did not like police officers and wanted to kill one, made years before and years after he attempted to do so, properly admitted as relevant to his state of mind].)

Lastly, Renteria argues that the rap lyrics recovered from the car he was driving were insufficiently authenticated since the car did not belong to him

---

[6] Ochoa testified that the man was not Renteria and mentioned the "Colonia" gang rather than the Crimies, but the jury evidently discredited those details.

12

and two other persons were present.  Authentication of rap lyrics need not be accomplished through statutorily created means, but can be done through the location in which they were found and their content.  (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1372.)  Renteria was driving the car, and the lyrics were found in the center console, a natural place for the driver to store personal effects.  Moreover, the lyrics' content was similar to those performed by Renteria in the rap video.  In the video he states, "I'm ready to spray any day in the motherfuckin' light of broad day.  All day the C gang don't give a fuck."  The lyrics from the car state, "'All you all better duck quick because I don't give a fuck.  Even in the broad day, I'm aiming at your fucking brains.'"

The trial court did not abuse its discretion by admitting the rap evidence.  As there was no error under state evidence law, Renteria's derivative claim under the federal Constitution is also meritless.  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1311.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

YEGAN, Acting P. J.

TANGEMAN, J.

13

Manuel J. Covarrubias, Judge

Superior Court County of Ventura

_____

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, and Tannaz Kouhpainezhad, Deputy Attorney General, for Plaintiff and Respondent.